RINGSBY TRUCK LINES, INC., et al., Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Portland Freight Traffic Association, West Coast Traffic Committee of the Toy Manufacturers Association, National Small Shipments Traffic Conference, Inc., and Drug and Toilet Preparation Traffic Conference, Intervening Defendants.

Civ. A. 66–C–467.

United States District Court
D. Colorado.

Jan. 5, 1967.

LeGrand A. Carlston and Z. L. Pearson, Jr., Denver, Colo., and Jones, Meiklejohn, Kehl & Lyons, by Alvin J. Meiklejohn, Jr., and David E. Driggers, Denver, Colo., for plaintiffs.

Donald F. Turner, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., and Lawrence M. Henry, U. S. Atty., Denver, Colo., for defendant United States.

Robert W. Ginnane, Gen. Counsel, and Leonard S. Goodman, Asst. Gen. Counsel,

I.C.C., Washington, D.C., for defendant Interstate Commerce Commission.

Paul, Shwayder & Weinshienk, by Bruce B. Paul, Denver, Colo., and White, Sutherland & Gilbertson, by William F. White, Portland, Or., for intervening defendants Portland Freight Traffic Ass'n and West Coast Traffic Committee of Toy Mfrs.' Ass'n.

Anderson, Spangler & Wymore, by Edwin L. Spangler, Jr., Denver, Colo., and John J. C. Martin, New York City, for intervening defendants National Small Shipments Traffic Conference, Inc., and Drug & Toilet Preparation Traffic Conference.

Before BREITENSTEIN, Circuit Judge, and ARRAJ and CHILSON, District Judges.

### MEMORANDUM OPINION AND ORDER

ARRAJ, District Judge.

This action was instituted by fifteen motor carriers who seek to set aside, annul and enjoin a decision of the Interstate Commerce Commission, entered in "Increased Class & Commodity Rates, Transcontinental", 326 I.C.C. 397 (1966). In that decision the Commission found that a three per cent rate increase in "transcontinental rates" which had been put into effect in 1964 by 1400 motor carriers had not been shown to be "just and reasonable". The rate increase was therefore canceled by the Commission's order dated April 15, 1966. A petition for reconsideration was denied, and the original order was modified so as not to become effective until September 12, 1966. On September 9, 1966 this Court entered a temporary restraining order preventing the Commission from canceling the rate increase; and on November 4, 1966, following a hearing on an application for an interlocutory or a permanent injunction, the Court ordered that the temporary restraining order remain in effect until final determination by the Court.

We are now prepared to dispose of the matter on the merits. This is a

limited administrative review, governed by the terms of the Administrative Procedure Act, Title 5 U.S.C. § 1009, which essentially embodies the "substantial evidence" rule.

As evidence that their rate increase was "just and reasonable", the carriers had prepared traffic and cost studies, designed to reflect their expenses and revenue and need for an increase. The rate was published to go into effect on August 1, 1964. On August 3, 1964 the Commission entered an order requiring that the carriers seeking the increase submit detailed evidence and statistical data supporting their need for the increase.

For preparing the study, the carriers obtained traffic data from eighteen carriers for one week, which included all bills dated June 19, 1963, and all bills dated June 16–18 and 20–22, 1963 for shipments with a billed weight of 10,000 pounds or more. The cost and traffic studies, and the underlying working papers were deposited with the Commission, and a hearing was held by a Hearing Examiner on November 30, 1964.

The evidence before the Examiner consisted of the studies themselves, testimony by verified statements from the expert transportation consultant who had prepared the study, and from various officials of the carrier companies involved in the increases, as well as verified statements of some protestants. There was also cross-examination of some of those witnesses who had submitted verified statements, including plaintiffs' transportation consultant.

The Hearing Examiner recommended to the Commission that the increase be approved. He specifically found that the study carriers were representative of the entire class affected, that the studies were in all respects proper, and that the carriers had demonstrated their need for additional revenue.

The Commission elected to investigate, rather than suspend, the rate increase, and on April 15, 1966 the Commission entered its report and order finding that the rate increase had not been shown to be just and reasonable and ordering that the rate be canceled. In the report the Commission concluded that the carriers had not sustained their burden of proof, and more specifically that the cost studies could not be given probative value because the carriers selected for the study had not been shown to be representative of the entire group, and the traffic sample (particularly the period selected for the study) had not been shown to be statistically sound. Neither of these grounds had been raised by any of the protestants, who challenged the increase on different grounds.

■■ It is quite clear that the burden of proof is on carriers to show that a proposed rate increase is "just and reasonable", see, e. g., Accelerated Transport-Pony Express, Inc., v. United States, 227 F.Supp. 815 (D.Vermont 1964), and, of course, cost studies constitute a necessary ingredient of the proof needed to sustain that burden. The carriers here, however, contend that the evidence adduced by them was in all respects the same type and degree of evidence which has in the past been held to be sufficient to carry the burden of proof in motor carrier rate increase cases. They argue that in holding that the carriers have not met their burden, the Commission is apparently applying new and different standards of proof of which the carriers were not sufficiently apprised.

■ Certainly when carriers appear before the Commission, they are entitled to know by what standards they are going to be judged. This Court has recognized this basic principle, Eddleman v. United States, 229 F.Supp. 231 (1964), and indeed the Commission itself has said that "in fairness, standards should not be changed without due notice." General Increases—Transcontinental, 319 I.C.C. 792, 803 (1963). See also, E. Brooke Matlack, Inc., v. United States, 119 F.Supp. 617 (E.D.Pa.1954).

An obvious question is whether the quantum of proof adduced by the carriers in the present case was, as they con-

tend, equal to the proof which the Commission has in the past held to be sufficient. The evidence offered to establish that the carriers selected for the study were representative of the entire class of carriers affected by the rate increase consisted of the opinion of the transportation consultant who prepared the study, and the statements of officials of the various companies. On cross-examination the transportation expert explained why he selected the study carriers:

> Yes, one of the peculiarities of the transcontinental traffic is that there are a relatively small number of truck line carriers who participate in the vast majority of the transcontinental traffic. There may be many carriers who originate the traffic and other carriers that terminate it, but these carriers perform the principal transcontinental transportation. In a traffic study of the type here designed since the study carriers reported all of their bills, not merely the traffic they originated, we picked up in the traffic study all of the shipments originated by connections in the East or the West and given to these carriers and all of the traffic which these carriers gave to connections with the East and West for determination. By working with a numerically small group of carriers it was possible to make a comprehensive survey of the entire transcontinental traffic. (Transcript, pp. 60–61).

> \* \* \* \* \* \*

> I used the term representative in the sense of a group of carriers whose traffic would produce a substantial picture of the transportation characteristics of the transcontinental traffic. (Transcript p. 62).

It does appear that in the past the Commission has required no more as evidence of the representativeness of the carriers employed in a cost study than the considered judgment of an expert witness. See, e. g., Cheese Food from Detroit Lakes to Kansas City, 306 I.C.C. 295 (1959); and Middle Atlantic Con-

ference v. A.A.A. Trucking Corp., 302 I.C.C. 499, 510–511 (1957).

While the opinion of an expert need not be accepted as conclusive evidence by the Commission, it is significant that in the present case there was absolutely no countervailing evidence on the question of the representativeness of the carriers selected for the study. In Davis & Randall, Inc., v. United States, 219 F.Supp. 673, 678 (W.D.N.Y.1963), Circuit Judge Friendly disapproved the Commission's view that "even in a proceeding where there is no adversary, it is always free to disregard expert testimony offered by the proponent without communicating its criticisms before decision, so long as it does not rely on 'facts' outside the record." He further noted that:

> Somehow it does not seem consistent with the policy underlying the APA that an agency should be able to reject such testimony on the basis of arguments which the expert never heard and which he might well have been able to answer. Id. at 678–679.

The report of the Commission in the present case contained no finding that the expert witness had been *disbelieved*. Therefore, it does appear on the face of it that the Commission has changed its required standards of proof in this regard.

As the carriers point out, for the Commission to conclude that these study carriers are not representative is to some extent to contradict some of their prior holdings, in which most of these same carriers were employed in cost studies. See, e. g., Transcontinental Motor Rates—Increases, 49 M.C.C. 211 (1949), Transcontinental and Rocky Mountain Increases, 54 M.C.C. 377 (1952), Transcontinental and Western Increases, 1952, 61 M.C.C. 755 (1953), Increases, Transcontinental—Intermountain Coast, 304 I.C.C. 15 (1958), and General Increases—Transcontinental, 319 I.C.C. 792 (1963). The carriers also point to the fact that eight of the eighteen carriers in the present cost study had also been used in a recent study by the Commission itself; this fact also seemed persuasive

to the Hearing Examiner. (Hearing Examiner's report, p. 5). The Commission stated, however, that "the inclusion of the additional carriers may or may not distort the picture", 326 I.C.C. at 405; this fact was therefore not impressive with the Commission. It is interesting to note that the Commission *has* in the past pointed to such a fact as evidence of representativeness. See General Increases—Eastern Central Territory, 316 I.C.C. 467, 471 (1962). All of these factors suggest that the evidence adduced by the carriers in support of their selection of representative carriers for the study was substantially the same as the evidence which has in the past been held to be sufficient.

The Commission's other ultimate finding was that the carriers had not demonstrated that the period used for the study was typical for a full year's operation. As previously noted, for the purposes of the study, the eighteen study carriers compiled data for one week, including all bills dated June 19, 1963, and all bills dated June 16–18 and 20–22, 1963 for shipments having a billed weight of 10,000 pounds or more. As to his reason for selecting this period, the expert testified on cross-examination: "The dates selected in June were the earliest possible dates for which the carriers could organize themselves to provide the required data. A week was taken in the *middle of June to avoid peaks in traffic.* * * * *" In his verified statement the expert stated that he felt that the period was representative, and numerous officials of the carrier companies testified that the period was surprisingly typical or normal for their companies.

The Commission has in the past upheld studies in which the period of the study was as short or shorter than that in the present case. See, e. g., Transcontinental and Rocky Mountain Increases, 54 M.C.C. 377 (1952); and Transcontinental Motor Rates—Increases, 49 M.C.C. 211 (1949). A particularly apposite case is General Increases—Eastern Central Territory, 316 I.C.C. 467, 471 (1962), in which the period of the study was quite similar to that in this case. When the representativeness of the period was assailed by protestants, the Commission stated:

> The shippers contend that the sample is not representative of the consist of the total traffic of respondents, and indicate a preference for other sampling methods. The type of sample used herein has been found acceptable in numerous prior proceedings. It is clear that the respondents did not choose a particular day or period with a view toward obtaining the result most favorable to their position. * * The criticism of the sample as such is without merit.

The study before the Commission in that case "was based on all less-than-truckload shipments billed on May 25, 1960, and on all truckload shipments billed on for the 5 day workweek beginning May 23, 1960." The traffic sample in that case was therefore strikingly similar to the sample in the case at bar. There is certainly no evidence in the present record that the carriers chose "a particular day or period with a view toward obtaining the result most favorable." Nonetheless, the Commission concluded that: "The respondents (sic) contention that the period selected is a representative period of time is simply conjecture and begs the real question of establishing this fact." 326 I.C.C. at 405–406. Again it appears that the Commission has departed from the standard of proof which it required in earlier cases. If the carriers have in fact failed to come forth with the amount and types of proof which have *always* been required of carriers seeking a rate increase, the Commission has certainly failed to point out specifically in what respects they fell short.

The carriers contend that this holding of the Commission mirrors not only the Commission's recent dissatisfaction with the long-used method of compiling cost data, but also an insistence that a completely new system of sampling, called random or probability sampling, be used. We are not prepared to draw such a con-

clusion from a reading of the Commission's opinion, but if this is, in fact, the unexpressed basis for the Commission's holding, it is quite clear that this would constitute such a radical departure from its former standards that detailed notice should have been given to the carriers.

A report and order of the Commission dated September 29, 1966 and entitled "Motor Carrier Probability Sampling Studies" is a part of the record before us. This report *does* give notice to the carriers that probability sampling methods should be used for future studies, and the Commission itself recognizes the need for giving adequate notice: "[W]e consider the introduction of probability sampling in the preparation of such special reports to be an innovation of such importance as to justify a reasonably comprehensive report * * *." (at p. 4).

If the Commission's preference for this sampling method was the underlying rationale of the Commission's holding in the instant case, it cannot be sustained, for proper notice was not afforded.

That the Interstate Commerce Commission has the right from time to time to change its policies cannot be questioned. * * * However, where, as here, an applicant relying in good faith upon previously determined standards, as expressed in previous written statements or conclusions of the agencies, acts in strict accordance with such standards, such applicant should not be precluded from an opportunity to meet the revised standards if, without notice, the agency determines upon new and perhaps more sensitive standards. E. Brooke Matlack, Inc., v. United States, 119 F.Supp. 617, 622 (E.D.Pa.1954).

Defendants place considerable emphasis on the August 3, 1964 order of the Commission in which it was stated that the respondents would be required to submit "detailed data to establish the representative nature of the carriers used". If the Commission's decision was based on a finding that the carriers had not complied with this order, that fact is certainly not readily apparent from a reading of the Commission's report. Significantly, neither the Commission in its opinion, nor the defendants in their argument have suggested what might constitute such "detailed data". It is interesting to observe that in its recent report on the "Motor Carrier Probability Sampling Studies", mentioned supra, the Commission discussed the method of selecting representative carriers for the cost studies, and concluded that "we can find no justification for changing the previously used standards for selecting carriers to participate in the special studies." (p. 16). It appears, therefore, that even the Commission knows of no improved standard for selecting the representative carriers; and under the previously used standard, the selection is left to the informed judgment of the expert preparing the study.

■■ The major difficulty which we encounter in reviewing the opinion of the Commission under the "substantial evidence" rule is that the Commission's findings amount to little more than the conclusion that the carriers did not sustain their burden of proof. It is, of course, true that the Commission is the sole judge of the weight of the evidence before it, "[b]ut where, as here, the carrier has presented impressive evidence to support the proposed rate, the Commission may not hold the rate unlawful upon the mere statement that the carriers have not sustained their burden of persuasion." New York Central R. Co. v. United States, 99 F.Supp. 394, 401 (D.Mass. 1951).

"[W]here, as here, the ultimate finding is negative in form, it need be supported only by 'sufficient basic findings of fact to warrant a reviewing court in concluding that the Commission was not without rational grounds' for holding that burden has not been met." Chicago & E.I.R. v. United States, 107 F.Supp. 118, 125 (S.D.Ind.1952), aff'd., 344 U.S. 917, 73 S.Ct. 346, 97 L.Ed. 707 (1952).

The question then is whether the Commission's opinion contains "suffi-

cient basic findings of fact." In concluding that the carriers had not shown the study carriers to be representative of the entire class, the Commission observed that only twelve of the eighteen carriers were shown to have been participating in transcontinental traffic. (p. 405). There was actual evidence by twelve carriers as to what percentage of their total traffic is transcontinental, and the remaining six all had extensive transcontinental rights. The cost study itself took into account the relative participation of each carrier in transcontinental traffic, which presupposes, of course, that all of the carriers were to some extent operating in that traffic. As the carriers point out, the obvious reason why there was no testimonial evidence as to the six carriers was that they were not asked the question on cross-examination. It was also pointed out that three of these six carriers participated in the Commission's own study; in other words, this observation by the Commission does not afford a "rational ground" for its decision.

The Commission also emphasized the fact that only seven per cent of the total traffic participated in by one of the carriers was transcontinental. This factor is certainly *not* particularly relevant, however, in view of the fact that the studies were *weighted* so as properly to take into account the greater or lesser degree of participation by each study carrier. This is clear from the verified statement of the transportation consultant, and this fact seems to have been recognized at one point by the Commission. (Appendix to the report, 326 I.C.C. at 410).

■ It is therefore apparent that the findings and reasoning of the Commission are insufficient to justify its holding. Yet it is fundamental that the Commission must " 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' " Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). The report of the Commission simply fails to "articulate any rational connection between the facts found and the choice made", Burlington Truck Lines, Inc., supra, and the matter should therefore be remanded to the Commission for further findings.

■ A remand is necessary because the Court is unable to determine the real reasons for the Commission's holding— whether the Commission actually changed the standard in this case from judgment sampling to probability sampling, whether it changed its quantum of proof required, whether the Commission simply did not believe the expert witness for the carriers, or whether the Commission concluded that the carriers did not comply with its procedural order of August 3, 1964. Upon remand the Commission should explain with some detail exactly how the carriers failed to prove their case, and what standards are being applied. Similarly if the Commission concludes that the carriers did not disclose sufficient detailed data, it should explain what type of data it is requiring. If the Commission requires more evidence upon remand, it can, of course, receive it. In any case, if the Commission has no more rationale for its decision than what is contained in its original report and order in 326 I.C.C. 397, this Court cannot affirm.

It is therefore ordered that the Commission's order of April 15, 1966 as modified on July 26, 1966, be vacated and set aside and that this matter be remanded to the Commission for further proceedings in conformity with this opinion.